### 32492. NORRIS *v.* PIG'N WHISTLE SANDWICH SHOP INC.

DECIDED JUNE 1, 1949.

*Francis G. Jones,* for plaintiff.

*Matthews, Long & Moore,* for defendant.

SUTTON, C. J.   J. D. Norris sued Pig'n Whistle Sandwich Shop Inc., in Fulton Superior Court, for damages on account of injuries received from swallowing a fragment of bone while eating a barbecued-pork sandwich, consisting of barbecued pork meat and other substances placed in a bun, which was purchased from the defendant.

The facts on which the action is based, as shown by the petition, are as follows: On Monday, November 10, 1947, about 1 p. m., the plaintiff requested one of his employees, N. G. Ward, to purchase a barbecued-pork sandwich from the defendant's retail shop located on Peachtree Road in Atlanta across the street from the plaintiff's candy manufacturing business. Ward purchased the sandwich and brought it to the plaintiff, who was in his office at the time, and the plaintiff took one or two bites from it, and immediately thereafter noticed a peculiar sensation in his throat and began coughing. This condition became worse and about 45 minutes later he was carried to the office and hospital of Dr. Murdock Equen, and Dr. Equen performed an emergency operation and removed a piece of pig bone by inserting an instrument in the plaintiff's mouth and pushing it to a point 7 or 8 inches below the plaintiff's throat. From the description of the fragment of bone, as shown by the petition, and also as shown in the brief of evidence, it appears that this bone

was somewhat in the shape of a rectangular solid, varying in thickness from about 1/32 of an inch or less along one long and one short side to about 1/10 to 1/20 of an inch in thickness along the other sides, and being about 3/4 of an inch long, the long sides being curved, and about 3/8 of an inch wide. It is alleged that the defendant's agents and servants were negligent in not discovering and removing the piece of bone before preparing and serving the meat in the bun, and that said acts were in violation of Code § 42-109 (7) of the pure food and drug laws.

The defendant demurred generally and specially to the petition, and in its answer denied the allegations, except as to the jurisdiction. The grounds of special demurrer were directed to certain paragraphs of the petition, showing elements of damage in regard to loss of profits and additional expense incurred at the plaintiff's business while he was away, as being too remote and speculative. The trial judge overruled the general demurrer and sustained the grounds of special demurrer and ordered the paragraphs of the petition stricken in this respect upon failure of the plaintiff to amend within a certain time. The plaintiff excepted pendente lite to the judgment sustaining the grounds of special demurrer. Certain amendments to the petition were later allowed and filed, to which the defendant demurred, but these amendments were withdrawn in toto by the plaintiff before the case proceeded to trial before a jury, thus leaving the petition as it was after the order of the judge striking the paragraphs in respect to loss of profits and additional expense incurred.

It appears from the evidence that the sandwich was delivered to the plaintiff's employee enclosed in a wrapper, and that he delivered it to the plaintiff in this same state; that there was nothing wrong with the sandwich other than the fact that it contained the particle of bone which was swallowed by the plaintiff; and that the meat part of the sandwich consisted of small slices or particles of pork. An employee of the defendant was sworn as a witness for the plaintiff and testified that he was employed by the defendant at the time of the purchase of the sandwich on November 10, 1947; that his duties consisted of preparing sandwiches and waiting on customers; and that, although he did not know the plaintiff's employee who purchased the food for the plaintiff, he could have been the one who waited

on him. This witness testified in detail as to the preparation of the meat, and his testimony· indicates that the meat is carefully inspected, that particles of bone are ordinarily removed before the meat is placed in a bun, and that if a bone such as was shown to him was present in the meat, it would normally be found and removed before placing the meat in a bun. The manager of the defendant's shop was also sworn as a witness for the plaintiff and he testified in detail as to the preparation of the meat and the inspection it receives while it is being sliced and cut into small portions before being used, and that a bone the size of the bone in question would normally be taken out of the meat.

On motion of the defendant, the trial judge granted a nonsuit, and the plaintiff excepted to this judgment, and to the judgment sustaining the grounds of special demurrer and striking certain paragraphs of his petition.

■ The paragraphs of the petition which were stricken deal in general with the loss of expected profits and additional expenses incurred during the time that the plaintiff was away from his candy manufacturing business, November 10-18, 1947, while recuperating from the effects of the swallowing and removal of the fragment of bone. It appears from these allegations of the petition that the plant would probably have remained open, and that production would have continued if the plaintiff's foreman had not also been absent on account of drunkenness. As pleaded, the alleged damages are remote, speculative, contingent, and uncertain, and were dependent on whether or not the plaintiff would have been able to keep the plant in production, and whether or not he would have been able to make certain sales and fill certain orders, even if he had been in good health and present at the business during the period of his absence. "Direct damages are such as follow immediately upon the act done. Consequential damages are such as are the necessary and connected effect of the tortious act, though to some extent dependent upon other circumstances." Code, § 105-2007. "If the damages are only the imaginary or possible result of the tortious act, or other and contingent· circumstances preponderate largely in causing the injurious effect, such damages are too remote to be the basis of recovery against the wrongdoer." § 105-2008.

"'Damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered; but damages traceable to the act, but not its legal or natural consequence, are too remote and contingent."§ 105-2009. "It may be stated as a general rule that in tort actions a recovery may be had for loss of profits, provided their loss is the proximate result of the defendant's wrong and they can be shown with reasonable certainty. The profits recoverable in such cases are limited to probable, as distinguished from possible benefits. They must be such as would be expected to follow naturally the wrongful act and be certain both in their nature and the cause from which they proceed. Profits which are remote, or speculative, contingent or uncertain are not recoverable, as, for example, the prospective profits of a contract between the plaintiff and a third person of which the defendant had no notice." 15 Am. Jur., Damages, § 155. "A plaintiff who seeks reparation in damages to his business, from a breach of contract, is limited to the recovery of damages which are the natural and material consequence of the act from which the damage flows. Loss of prospective profits is ordinarily too remote for recovery. The profits of a commercial business are dependent on so many hazards and chances, that unless the anticipated profits are capable of ascertainment, and the loss of them traceable directly to the defendant's wrongful act, they are too speculative to afford a basis for the computation of damages." *Cooper* v. *National Fertilizer Co.*, 132 *Ga.* 529, 535 (64 S. E. 650). "The general rule is that the expected profits of a commercial business are too uncertain, speculative, and remote to permit a recovery for their loss." *Palmer* v. *Atlantic Ice & Coal Corp.*, 178 *Ga.* 405 (2) (173 S. E. 424, 92 A. L. R. 176). Also, see 15 Am. Jur., Damages, § 157. It was not error for the trial judge to sustain the grounds of special demurrer directed to the paragraphs of the petition dealing with the loss of expected profits and additional expenses during the time the plaintiff was away from his candy manufacturing business on account of his alleged injuries.

■ The present action is based on negligence. This alleged negligence consists of certain allegations of negligence as a matter of fact, and of negligence as a matter of law in the violation of the provisions of Code § 42-109 (7), a part of the pure food and drug laws; and this section provides that an article of food shall

be deemed to be adulterated "If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter." Code § 105-1101 is as follows: "Any person who knowingly or carelessly sells to another unwholesome provisions of any kind, the defect being unknown to the purchaser, by the use of which damage results to the purchaser or his family, shall be liable in damages for such injury." In *Donaldson* v. *Great Atlantic & Pacific Tea Co.*, 186 *Ga.* 870, 876 (199 S. E. 213, 128 A. L. R. 456), the Supreme Court said: "In a suit for damages against a seller of unwholesome food by the use of which the plaintiff is injured, it is still necessary to prove that the defendant either knew of the unwholesome condition of the food or was guilty of negligence in the transaction. But how may such negligence be established? As to civil actions, the only effect of the pure-food act is that whereas *before* its passage an action for damages resulting from negligence could be sustained only by allegation and proof of such negligence as a matter of fact, that is, according to the standard of ordinary prudence as applied to the circumstances, the plaintiff may *now* show negligence as a matter of law by establishing a breach of the statutory duty; or he may rely on both classes of negligence, according to the facts. In other words, the passage of this statute did not affect the nature or basis of the cause of action, but related only to the standard of care by which negligence may be determined." The present case is here on a judgment of nonsuit, and in determining whether or not the case was properly withheld from consideration by a jury, this court must take that view of the evidence most favorable to the plaintiff. We now come to a consideration of whether or not there was evidence from which the jury might determine as a matter of fact or as a matter of law that the defendant was guilty of negligence which was the proximate cause of the plaintiff's injuries.

■ Was there evidence of negligence as a matter of fact which would require the submission of the case to a jury? The two employees of the defendant who testified for the plaintiff stated in their testimony that such a particle of bone as the

plaintiff swallowed would normally be discovered and removed. But these same witnesses also testified in detail as to the means used to discover and remove particles of bone from the meat, and it appears that the meat was carefully inspected before being placed in a bun.  This fact is uncontradicted, unless the presence of the particle of bone in the meat in the bun creates an inference that the defendant's employees were careless in their inspection. Is one who prepares and sells food products required to furnish an absolutely perfect product in this respect?  To permit an inference of ordinary negligence from the mere presence of a particle of bone in a meat sandwich would place the seller of the food in the position of a virtual insurer of the perfection of the food.  As will hereinafter be discussed, even in those jurisdictions where the actions have been based on the breach of an implied warranty, the seller is not required to furnish a perfect product in respect to particles of bone likely to be present in the food. The presence of a particle of bone in a meat sandwich does not amount to negligence in allowing a foreign substance to become mixed with the food, thereby contaminating it or rendering it unwholesome and unfit for consumption.  That type of case, and the cases where what was in the food which caused the injury remains unexplained, the only evidence in this respect being a proof of injury caused by the consumption of the food, are not analogous to the present case.  Here the cause of the injury, a particle of bone, and the condition of the food, which was good in every respect, are explained.  A particle of bone in a food prepared from meat is something which one might ordinarily expect to find in the food, and one should anticipate its presence and guard against possible injury from swallowing it.  Under the facts of this case, the defendant was not required, in the exercise of ordinary care, to discover and eliminate every single particle of bone from the barbecued-pork sandwich, and the mere presence of a particle of bone in the sandwich does not authorize an inference of negligence in preparing and furnishing the food to the plaintiff.

■ Was there evidence showing a violation of the provisions of Code § 42-109 (7)?  The plaintiff contends that the fragment of bone was a "portion of an animal unfit for food," and that the food was thus adulterated within the provisions of the above

Code section, which is quoted supra. The clear intent of the statute expressed by the use of these words, when considered with the other language of the statute, and the purpose and scope of the pure food and drug laws, is to refer to any portion of an animal unfit for food and contained in the food which thereby renders such food unfit for its intended consumption. Certainly it was not the intent of our lawmakers to deem an article of food, containing meat, adulterated merely because it contained portions of the animal which were inedible, but which did not render such food unfit for its intended consumption. Otherwise numerous articles of food which necessarily contain inedible portions of animal matter would be deemed adulterated. Numerous meats and fish are normally prepared which contain bone and other inedible matter indigenous to the animal from which the food is derived, yet these articles of food could not be deemed adulterated. The evidence indicates that the barbecued-pork sandwich contained nothing that would render it unfit for food within the purview of the provisions of Code § 42-109 (7), as containing a "portion of an animal unfit for food," and under the evidence the defendant cannot be said to be guilty of negligence per se in violation of this statute so as to require the submission of the case to a jury.

There seems to be no Georgia decision entirely applicable to the facts of this case, but we have given careful consideration to the decisions of other jurisdictions where the facts were similar to the facts of this case, although in considering these cases it has been noted that the actions were usually based on the breach of a warranty, as well as on negligence. But the principles announced in certain of these cases appear applicable and persuasive in the case at bar. In Mix v. Ingersoll Candy Co., 6 Cal. 2d, 674 (59 Pac. 2d, 144), it appears that the plaintiff swallowed a piece of chicken bone while eating chicken pie in a restaurant operated by the defendants. The action was brought in two counts, one based on an alleged breach of warranty, and the other on negligence. The trial court dismissed the case on demurrer, and this judgment was affirmed by the Supreme Court of California. The court, in ruling on the count based on the breach of an implied warranty, stated, among other things: "Although it may frequently be a question for a jury as the

trier of facts to determine whether or not the particular defect
alleged rendered the food not reasonably fit for human consump-
tion, yet certain cases present facts from which the court itself
may say as a matter of law that the alleged defect does not fall
within the terms of the statute. It is insisted that the court may
so determine herein only if it is empowered to take judicial notice
of the alleged fact that chicken pies usually contain chicken
bones. It is not necessary to go so far as to hold that chicken
pies usually contain chicken bones. It is sufficient if it may
be said that as a matter of common knowledge chicken pies oc-
casionally contain chicken bones. We have no hesitancy in so
holding, and we are of the opinion that despite the fact that a
chicken bone may occasionally be encountered in a chicken pie,
such chicken pie, in the absence of some further defect, is
reasonably fit for human consumption. Bones which are natural
to the type of meat served cannot legitimately be called a
foreign substance, and a consumer who eats meat dishes ought
to anticipate and be on his guard against the presence of such
bones. At least, he cannot hold the restaurant keeper whose
representation implied by law is that the meat dish is reasonably
fit for human consumption, liable for any injury occurring as a
result of the presence of a chicken bone in such chicken pie."
And, in ruling on the count based on negligence, the court said:
"With reference to the count based upon negligence, the same
logic and reasoning applies. The facts pleaded do not establish
a lack of due care on the part of the restaurant keeper. We do
not believe it is a question of contributory negligence on the
part of the customer, but a question of whether or not a restau-
rant keeper in the exercise of due care is required to serve in
every instance a perfect chicken pie, in that all bones are entirely
eliminated. If the customer has no right to expect such a perfect
product, and we think he is not so entitled, then it cannot be
said that it was negligence on the part of the restaurant keeper
to fail to furnish an entirely boneless chicken pie." In Silva
v. F. W. Woolworth Co., 28 Cal. App. 2d, 649 (83 Pac. 2d, 76),
it appears that the customer swallowed a fragment of bone while
eating turkey dressing  The action was based on a breach of
warranty and on negligence. The court followed the rulings in
the Mix case and reversed a judgment of the lower court in

favor of the plaintiff. The same result was reached in Brown v. Nebiker, 229 Iowa 1223 (296 N. W. 366), where it appears that the decedent swallowed a fragment of bone while eating a pork chop. The action there was based on the breach of an implied warranty and on negligence. In Goodwin v. Country Club of Peoria, 323 Ill. App. 1 (54 N. E. 2d, 612), it appears that the decedent swallowed a particle of bone while eating creamed chicken, and the Illinois court reached the same result. In that case the action was in three counts, two being based on negligence, and one on a breach of warranty. The plaintiff contends that cases of this sort "are clearly distinguishable from the case at bar because all those cases involved the serving of meat by defendant in an open plate," where the bones were patent. Although it may be easier to discover bones in a pork chop, the presence of bones in a chicken pie, turkey dressing, and creamed chicken would appear to be no more patent than in a barbecued-pork sandwich.

■ The trial judge did not err in granting a nonsuit.

*Judgment affirmed. Felton and Parker, JJ., concur.*